# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 07cr0033 |
| | ) | |
| JOSEPH DOUGLAS WILLIAMS | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

March 24, 2008

Currently before the Court are the following pretrial motions filed by the Defendant:

- MOTION TO SUPPRESS PHYSICAL EVIDENCE (1 BLACK Llama .45 CALIBER SEMI-AUTOMATIC PISTOL) (*Document No. 41-1*); and

- MOTION TO SUPPRESS STATEMENTS (*Document No. 41-2*).

On January 3, 2008, the Court conducted an evidentiary hearing on the suppression motions at which all parties were represented by counsel who presented and argued the issues skillfully and effectively. Officer Daniel C. Nowak, Officer Mandy Hatfield, Lieutenant Robert Roth and Officer Jeffrey Brock of the City of Pittsburgh Police Department testified on behalf of the government. Christy Somerville and Angela Prude testified on behalf of the Defendant.

At the conclusion of the suppression hearing, the Court ordered that a transcript of the proceedings be prepared and that counsel, if so desired, could file post-hearing brief(s) within twenty (20) days of the filing of the transcript and could file reply briefs, if so desired, ten (10) days thereafter. The post-hearing briefs were timely filed and the matter is now ripe for disposition.

Based on the testimony and evidence presented at the suppression hearing, the applicable law, and having made credibility determinations,[1] the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d):

**FINDINGS OF FACT**

On the evening of April 16, 2006, Officer Daniel C. Nowak ("Nowak") was on duty in full uniform, in a marked police vehicle, monitoring traffic.[2] He was located in a parking lot near the intersection of Brownsville Road and Agnew Street, in the Carrick area of Pittsburgh. At approximately 7:12 p.m., Nowak observed two vehicles "aggressively" driving down Brownsville Road -- a blue Dodge Caravan, which had two occupants, later determined to be the Defendant, Joseph Douglas Williams ("Williams"), and his girlfriend, Angela Prude,[3] and a Buick Skylark, which had one occupant, later determined to be Christy Somerville, the ex-girlfriend and mother of Mr. Williams' child. Nowak testified that the cars were "aggressively

---

[1] The determinations turn almost entirely on credibility assessments. As juries are regularly instructed, there is no magic formula for determining how much weight to give the testimony of a particular witness, or how to credit testimony which contains discrepancies. If a witness has testified falsely as to any material fact, the entire testimony of that witness may be disregarded upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything. However, such a witness need not be found totally unworthy of belief. A factfinder may accept so much of the such testimony as believed to be true, and disregard what is believed to be false.

[2] Officer Nowak has been employed by the City of Pittsburgh Police Department for a total of twelve (12) years.

[3] Both Officer Nowak and Christy Somerville testified that Williams was driving the Caravan down Brownsville Road. However, Angela Prude testified that she was driving the Caravan at all times.

2

driving," which he described as slamming on the brakes, using the horn, and yelling at each other. It appeared to Nowak as though the Skylark was "chasing" the Caravan. In Nowak's opinion, the individuals seemed to be involved in some kind of "road rage" incident.

As the vehicles approached the intersection where Nowak was parked, Williams yelled out the window of the Caravan "she's crazy," referring to the driver of the Skylark which was following the Caravan. Nowak testified that he also heard the driver of the Skylark frantically yelling that "he's dirty," [4] a reference to Williams. Nowak interpreted "dirty" as meaning that Williams was in possession of some type of illegal contraband, such as drugs or a firearm. Both Nowak and Somerville testified that Nowak yelled back to her and asked if Williams had hit her; Somerville did not reply, but rather drove away, again following the Caravan.

Nowak's initial observation of the situation was road rage, however after he heard the drivers yelling at each other, he assessed that this was a domestic incident, which according to Nowak, is more dangerous for police officers due to the high emotional involvement of the participants. Thus, Nowak took Somerville's comment that Williams was "dirty," very seriously considering the totality of the circumstances. Nowak's prior experiences caused him to approach the situation with a heightened sense of awareness.

Nowak pulled his marked vehicle out of the parking lot where he had been monitoring traffic and began to follow the Caravan and Skylark. He observed both vehicles

---

[4] Ms. Somerville testified that she did not say that Williams was "dirty," but rather yelled to Nowak that Williams was "a dirty ass mother fucker." Ms. Prude testified that she believed Ms. Somerville was screaming "he's dirty." Hearing Transcript at 140.

3

pull into a BP gas station, which was closed for renovations, and Nowak followed them into the BP parking lot. Nowak positioned his police car so as to face the Caravan, in such a way that, according to his testimony, he had a clear view of the passenger side of the Caravan. Nowak was parked about 25-30 feet away from the Caravan. When Nowak pulled into the lot, he observed that Williams had exited the Caravan, and was walking away from the driver's door, around the front of the van towards the passenger side front door.[5] Williams then opened the passenger door of the van. Nowak testified that he saw Williams pull a "black object" from his waistband, that Williams then appeared to place the object in the center area of the van between the two front seats, and then Williams covered the black object with a white towel.

Nowak testified that he thought the "black object" could be a firearm from the way Williams "palmed" the object with a cup-shaped grasp, which based on his training and experience, Nowak thought was consistent with the way a firearm is commonly grasped.[6] At this point, Nowak immediately called from inside his police vehicle for police backup. He testified that at the point when he saw Williams with the "black object," Williams was no longer free to leave the scene. Nowak testified as follows:

> Q: But he [Williams] was not free to leave there, once he pulled in there [the BP station]; is that correct?
>
> A: Yes. He could have. I wasn't stopping him.

---

[5] In fact, Nowak testified that Williams did not walk around the front of the van to the passenger door, but rather "pretty much ran." Hearing Transcript at 66.

[6] At the preliminary hearing held on April 26, 2006, Nowak conceded that the black object could have been a "fanny pack or anything like that," but also stated that "Being it was a heated domestic, my instinct was I want to make everybody safe and calm, and **I believed it was a weapon**." Transcript, Prel. Hearing at 18-19 (emphasis added).

4

> Q: At what point was he not free to leave?
>
> A: Whenever he got out of the vehicle, and I seen (sic) that the gun was in - - when he pulled the suspected weapon out there, he was not free to leave at that point in time.

Hearing Transcript at 50.

While Nowak was still in his police vehicle, Williams entered the passenger side of the van and closed the door. Somerville exited her car, and while frantically screaming "he's dirty," started to approach the Caravan. The driver of the van, Angela Prude ("Prude") placed the Caravan in reverse and began to back-up. Nowak then exited his police vehicle and ordered Prude to stop the Caravan, which she did. Nowak testified as follows:

> Christy Somerville was out of the car. She is yelling, approaching, screaming obscene language. He was yelling from the car, you know. . . . While I am getting out, I seen the weapon, possible weapon, to be placed in there. And they're still screaming, yelling at each other. Now he's (sic) trying to back up, get out of there. So, it was a lot of chaos going on at first. It was pretty heightened.

Hearing Transcript at 81. In an attempt to calm the situation, Nowak ordered Somerville back to her vehicle and told her to stop screaming.

Nowak then approached the Caravan with his hand on his firearm. As Nowak approached the passenger side of the van to speak to Williams, he observed that Williams' hands were free and not near the center console. The passenger window was open and Nowak asked Williams what was going on. Williams told him that Somerville was his ex-girlfriend, that he has children with her, that "she's crazy," and that she was chasing him. Hearing Transcript at 18.

As Nowak waited for his backup to arrive, he asked for identification from both Williams and Prude, the occupants of the Caravan. Nowak testified that he "could see that

5

[Williams] was getting more, more nervous and sweating profusely. . . He couldn't sit still." Hearing Transcript at 18-19.

Once the backup officers arrived on the scene,[7] Nowak signaled with his hand to the other officers that he suspected a weapon was in the Caravan. He then asked Williams to step out of the Caravan, to which Williams complied and did so with raised hands, although Nowak had not said anything to Williams about being under arrest at that time.[8]

Nowak testified that he asked for and received consent from Williams to conduct a pat-down search.[9] During the pat down, Nowak felt an unusual bulge in the front left pocket of Williams' pants, consistent with drugs, specifically marijuana, not a firearm. Nowak asked Williams about the bulge, and Williams admitted it was marijuana. Nowak then recovered the marijuana, placed Williams in handcuffs, and put him in his police vehicle.[10]

---

[7] Nowak testified that the backup officers arrived within 1-2 minutes after his call; Officer Brock testified that he arrived within 3-4 minutes of the call; and Officer Roth testified that he arrived within 5 minutes of the call. Angela Prude testified that the backup officers arrived within 5 minutes of Mr. Williams being asked to exit the Caravan.

[8] Nowak's testimony about the arrival of the backup officers was contradicted by all of his fellow officers who each testified that Williams was already in handcuffs when they arrived at the scene. Officer Brock testified that when he arrived at the scene, Nowak brought Williams, in handcuffs, over to his patrol car.

[9] In contrast, Angela Prude testified that Nowak commenced a pat-down search of Williams without asking or receiving consent from Williams.

[10] Nowak seized from Williams' pocket twelve (12) individual clear plastic bags of marijuana enclosed in one large clear plastic bag packaged in such a way that Nowak recognized from his prior experience and training was marijuana. Subsequent lab tests confirmed that the substance was indeed marijuana.

While walking to the police vehicle, Williams spontaneously yelled out "everything in the car is mine." Williams had not been advised of his *Miranda* warnings at this time. Prude was still in the Caravan at this point in time. She was subsequently escorted out of the Caravan by other officers at the scene and gave her oral and written consent to search the Caravan. Recovered from the Caravan was a .45 automatic weapon, retrieved from the front center floor, area console of the van, where Nowak had seen Williams place the "black object."[11] Once the firearm was recovered, Nowak again approached Williams to "see if he would agree to talk . . . Obviously, if he doesn't want to talk and has nothing to say to me, I'm not going to read him his rights and question him about this incident." Hearing Transcript at 69. According to Nowak, Williams agreed to speak to him and before he could read him his *Miranda* rights, Williams, without solicitation, blurted out again that everything inside the car was his. At that point, Nowak read Williams his *Miranda* rights. *Id.* at 70.

After being read his Miranda rights, Williams agreed to talk to Nowak about the contents of the Caravan without an attorney being present. Williams again repeated that everything in the van was his and went on to tell Nowak that there was a .45 automatic weapon in the van and that he did not possess a license to carry the weapon.

The police officers who searched Prude's purse found three (3) bags of marijuana similar in appearance to the marijuana found in Williams' pocket. Williams stated that he had placed the marijuana in Prude's purse and that the marijuana was his.

Williams also told Nowak that Somerville had assaulted him in the upper leg, near his groin, with a baseball bat, causing an injury for which he later received medical attention. A

---

[11] The firearm was found inside a black cloth pistol holster made by Ace Case.

baseball bat was observed in Somerville's car, but was not recovered.  Assault charges were eventually filed against Somerville.

On January 23, 2007, a federal Grand Jury returned a one-count indictment which charged Defendant with  Possession of a Firearm By A Convicted Felon on or about April 16, 2006, in violation of Title 18, United States Code, section 922(g)(1).  On January 30, 2007, a federal Grand Jury returned a one-count superseding indictment which charged Defendant with Possession of a Firearm By A Convicted Felon on or about April 16, 2006, in violation of Title 18, United States Code, sections 922(g)(1) and 924(e).

**CONCLUSIONS OF LAW**

The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." *U.S. Const. amend. IV*.  Stopping a car and detaining its occupants is considered a "seizure" and, therefore, subject to the protections of the Fourth Amendment, including a requirement of reasonableness under the circumstances. *United States v. Hensley*, 469 U.S. 221, 226 (1985).  On a motion to suppress evidence, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable. *United States v. Ritter,* 416 F.3d 256, 261 (3d Cir. 2005).

A.   *Constitutionality of The Terry Stop*

The threshold requirement for any Fourth Amendment analysis is government action that constitutes a search or seizure.  Police officers may approach individuals without reasonable suspicion or probable cause, and may question them without violating the Fourth

Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Such a "citizen encounter," the United States Supreme Court has explained, does not constitute a search or seizure under the Fourth Amendment: "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." *Florida v. Bostick,* 501 U.S. 429, 434 (1991). An individual approached in this manner "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Royer,* 460 U.S. at 498. Accordingly, the Supreme Court has held this to be a "consensual encounter that implicates no Fourth Amendment interest." *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984).

Beyond such a casual encounter, a brief "stop and frisk" is constitutionally acceptable if the officer has a "reasonable suspicion that criminal activity is afoot." *U.S. v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) (*citing Terry v. Ohio,* 392 U.S. 1 (1968)). Because a *Terry* stop is more intrusive than a citizen encounter, it constitutes a search and seizure within the meaning of the Fourth Amendment. The reasonable suspicion upon which the officer relies to institute a *Terry* stop must "be based upon specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. In determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *Id.*

Nowak's decision to not allow the Caravan to leave the BP parking lot was based on the behavior of Williams, specifically that Nowak observed Williams "pretty much run[ning]" around the front of the van and then withdrawing a "black object" from his waistband which he

9

placed in the front center of the van, which behavior the Court finds was sufficient to give a reasonable officer articulable suspicion that criminal activity was afoot.

Accordingly, the Court finds that Nowak's conduct was reasonable under the Fourth Amendment.

B.  *Terry* Frisk of Williams

Williams also argues that the Government has not met its burden to show that Nowak's pat-down search was conducted with valid consent.

A pat-down search is considered a "seizure" that is only justified under a few limited circumstances. Two such circumstances are where the officer has received the individual's valid consent to conduct the search and/or if the officer has an articulable suspicion that the individual is armed and dangerous. *Terry*, 392 U.S. at 1.

In analyzing whether an officer had a reasonable suspicion, courts "must consider the totality of the circumstances - - the whole picture." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000). Accordingly, "the significance of furtive actions and flight is equally applicable to both" *Terry* stops and searches incident to arrest, and can be the basis of individualized suspicion to justify a *Terry* frisk. *U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1972).

In the instant case, before Nowak decided to frisk Williams, he had seen Williams place what he reasonably believed to be a firearm inside the Caravan and he had heard Somerville yelling that Williams was "dirty." In addition, Nowak observed Williams appearing to be more and more nervous and begin to sweat profusely.

10

Nowak testified credibly that he decided to frisk Nowak because the situation in general, and Williams' behavior in particular, created a fear for his own safety: "It was an officer's safety issue. I didn't know if there was any other weapons on him." Hearing Transcript at 61.

Nowak testified that he obtained consent from Williams to conduct the pat down. However, even if consent was not obtained, in light of Nowak having an articulable suspicion that Williams may have been armed and dangerous, it was not necessary for Nowak to obtain consent prior to the pat down.

In light of the totality of the circumstances, the Court finds and rules that Nowak's decision to perform a pat down of Williams was reasonable.

C. *Voluntary Statements Made by Williams*

Williams argues that his statements were custodial statements and actions obtained in violation of the Fourth, Fifth, and Sixth Amendments and *Miranda v. Arizona,* 384 U.S. 436 (1966), and thus must be suppressed.

It is black letter law that *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Alston v. Redman*, 34 F.3d 1237, 1246-47 (3d Cir. 1994) (*citing Rhode Island v. Innis,* 446 U.S. 291, 300 (1980)). Interrogation means "express questioning or its functional equivalent . . . any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (*quoting Innis*, 446 U.S. at 300-01).

The Court finds that Defendant was clearly in custody, as he already had been placed in handcuffs, when he made the unsolicited statements to the police that everything in the van belonged to him. However, the Court also finds that Williams volunteered these statements without any prompting by the police. The police had not interrogated Williams at the point he made the statements at issue. In fact, the record shows that Nowak was in the process of taking out his *Miranda* card in order to read Williams his *Miranda* rights, when Williams stated for the second time that everything in the van belonged to him.

The Court finds and rules that Williams was not the subject of custodial interrogation at the time he made his spontaneous statements; thus, *Miranda* warnings were not required, and there was no violation of his constitutional rights. *Alston*, 34 F.3d at 1246-47.

## CONCLUSION

Based on the applicable legal principles, and the testimony of Officer Nowak, the Motions to Suppress filed by Defendant will be denied.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 07cr0033 |
| | ) | |
| JOSEPH DOUGLAS WILLIAMS | ) | |
| | ) | |

**ORDER OF COURT**

AND NOW, this 24th day of March, 2008, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

(i) the Motion to Suppress Physical Evidence filed by Defendant is **DENIED**;

and

(ii) the Motion to Suppress Statements filed by Defendant is **DENIED.**

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: Almon S. Burke, Jr.,
Assistant U.S. Attorney
Email: almon.burke@usdoj.gov

Jay J. Finkelstein,
Assistant Federal Public Defender
Email: jay_finkelstein@fd.org